## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CHRISTINE ANCHONDO,

      Plaintiff,

vs.                                                           No. CIV 00-1591 JP/LCS

LARRY G. MASSANARI,
ACTING COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

### MAGISTRATE JUDGE'S PROPOSED FINDINGS
### AND RECOMMENDED DISPOSITION

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse and Remand (Doc. 9), filed August 13, 2001. The Commissioner of Social Security issued a final decision denying Plaintiff's application for supplemental security income. The United States Magistrate Judge, having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, finds that the motion is not well-taken and recommends that it be **DENIED**.

### PROPOSED FINDINGS

1.    Plaintiff, now thirty-five years old, filed her application for supplemental security income on October 10, 1997, alleging disability commencing May 25, 1996, due to a fracture and bone tumor in her left tibia. (R. at 49-51; 62.) She has a high school education some vocational training, and past relevant work as a cashier-checker, stock clerk, and housekeeper. (R. at 12-13; 55.)

2.    Plaintiff's application for supplemental security income was denied at the initial level

on December 19, 1997, (R. at 30-31; 34-37), and at the reconsideration level on May 15, 1998.  (R. at 32-33; 40-42.) Plaintiff appealed the denial of her application by filing a Request for Hearing by Administrative Law Judge (ALJ) on July 10, 1998.  (R. at 43-44.)  The ALJ held a hearing on October 23, 1998, at which Plaintiff appeared and was represented by counsel.  (R. at 205.)  Plaintiff and Regina Gelles, a vocational expert (VE), testified.  (*Id*.)

3.      The ALJ issued his decision on December 22, 1998, (R. at 9-23), analyzing Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F. 2d 1482, 1487 (10th Cir. 1993).  At the first step of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity following her application.  (R. at 13.)  At the second step, the ALJ determined that Plaintiff had a severe impairment relative to the residual effects of the excision of a benign bone tumor (enchondroma) of the proximal tibia, but did not have a medically determinable mental impairment relative to depression.  (*Id*.)  At the third step of the sequential analysis, the ALJ found that the severity of Plaintiff's impairment had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599.  (R. at 14-17.)  The ALJ then found that Plaintiff had the residual functional capacity for work within the sedentary exertional level that did not required more than occasional kneeling, crawling, or crouching and did not require climbing ropes, scaffolds or ladders.  (R. at 20-21.)  The ALJ determined that Plaintiff was unable to perform her past relevant work.  (R. at 21.)  At step five, relying on the grids, ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 21-23.)

4.      Plaintiff filed a request for review of the ALJ's decision on February 18, 1999.  (R. at 8), and submitted additional evidence to the Appeals Council.  (R. at 183-204.)  On September 15,

2000, the Appeals Council, after considering the additional evidence, denied the request for review. (R. at 5-6.)  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.   On November 9, 2000, Plaintiff filed this action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

**Standard of Review**

5.      The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *See Hamilton v. Secretary of Health and Human Services,* 961 F. 2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Secretary of Health and Human Svcs.*, 985 F. 2d 1045, 1047 (10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F. 2d 407, 414 (10th Cir. 1983) (citation omitted)).  A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record.  *See Gossett v. Bowen*, 862 F. 2d 802, 805 (10th Cir. 1988).

6.      In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *See Thompson v. Sullivan*, 987 F. 2d 1482, 1486 (10th Cir. 1993) (*citing* 42 U.S.C. § 423(d)(1)(A)).

7.      At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R.

Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience.  *See id.*

## Administrative Record

8.      On May 3, 1996, Plaintiff fractured her left tibia when she fell on a tree root.  (R. at 143.)  Over the next several weeks, Plaintiff had severe pain, and finally went to the emergency room. (*Id.*) An MRI revealed a pathological fracture and a benign tumor, or enchondroma,[1] of the left proximal tibia.  (R. at 118-119; 143.)  Harry L. Galanty, M.D., of Texas Tech Health Sciences Center in Lubbock, Texas, placed Plaintiff in a walking boot for seven weeks.  (R. at 118-119)

9.      On September 9, 1996, Plaintiff was still in pain and her big toe was numb.  (R. at 122.)   Dr. Galanty had taken Plaintiff out of her cast boot, and she felt good at first, but then experienced pain in her leg and numbness in her toe.  (R. at 120.)  X-rays showed some sclerosis in the cortical regions and around the enchondroma.  (*Id.*)  Dr. Galanty recommended that Plaintiff start weight bearing, walking, exercising and that a biopsy of the enchondroma be considered if the pain continued.  (*Id.*)

10.      On January 6, 1997, Plaintiff presented to P. Tulk, a C.F.N.P at the office of Dr. P. Kelley, D.O., complaining of leg pain and requesting a prescription to help her sleep.  (R. at 142.) Vistaril[2] was prescribed.  (*Id.*) On January 8, 1997, James A. Boss, M.D. examined Plaintiff and

---

[1]  A benign cartilaginous growth starting within the medullary cavity of a bone originally formed of cartilage.  STEDMAN'S MEDICAL DICTIONARY 567 (26th ed. 1995).

[2] Vistaril is indicated for symptomatic relief of anxiety and tension associated with psychoneurosis and as an adjunct in organic disease states in which anxiety is manifested.

found she had an excellent range of motion in her hip, knee, and ankle, but that her tibia was painful on palpitation. (R. at 118.) Dr. Boss opined that, based on Plaintiff's X-rays of December 9, 1996, Plaintiff probably had a benign enchondroma. (R. at 119.) Dr. Boss stated that he did not treat bone tumors and referred Plaintiff back to Dr. Galanty. (*Id.*)

11.    On January 22, 1997, Plaintiff presented to Dr. Galanty with continued tibial pain and swelling. (R. at 116.) Plaintiff reported that the pain shot up and down her leg, she needed to use crutches, and her leg throbbed at night. (*Id.*) Dr. Galanty diagnosed possible pes tendinitis and tibial stress syndrome, administered an injection of Aristicort[3] and Marcaine,[4] and recommended that Plaintiff perform strengthening exercises, ice the area, and return in one week. (R. at 117.)

12.    On February 3, 1997, Dr. Galanty noted that Plaintiff showed no improvement. (R. at 115.) The injection had dulled the pain for two days, but the pain returned. (*Id.*) Plaintiff had continued tenderness over the tibia and fibula tubercle and minimal swelling. (*Id.*) Dr. Galanty diagnosed tibial pain, noted that he was running out of options, and planned to confer with Dr. Burchfield as to whether the enchondroma was worth evaluating in light of the prolonged duration of the pain. (*Id.*)

13.    On February 25, 1997, Daniel M. Burchfield, M.D. and T. Clark Robinson, M.D. wrote that Plaintiff reported that she was unable to work due to the leg pain, but that she did not have pain when she was not up on her feet. (R. at 113.) Examination revealed a full range of motion in

---

PHYSICIANS' DESK REFERENCE 2388 (54th ed. 2000).

[3] Aristicort is a corticosteroid used as an anti-inflammatory and anti-pruritic agent. PHYSICIANS' DESK REFERENCE 1094 (54th ed. 2000).

[4]Marcaine, also known as bupivacaine, is a local anesthetic. PHYSICIANS' DESK REFERENCE 6281 (54th ed. 2000).

her knee. (*Id.*) X-rays and an MRI revealed an enchondroma in the anterior proximal part of the tibia. (*Id.*) The doctors discussed the risks of surgery with Plaintiff.  (*Id.*)  Plaintiff stated that she desired to have something done to treat the pain that she reported to be disabling.  (*Id.*)  Dr. Burchfield and Dr. Robinson recommended that Plaintiff remain completely non-weight bearing for an extended period of time and then reassess surgical options. (*Id.*)

14.     A March 3, 1997, MRI revealed an apparent 2.5 by almost 4.0 centimeter enchondroma in the proximal tibia, a normal knee joint, and a normal tibial plateau.  (R. at 112.)  An April 15, 1997, bone scan was most compatible with, but not diagnostic for, a pathologic fracture and an existent enchondroma.  (R. at 110.)  This enchondroma had been stable for the past seven months.  (R. at 109.)

15.     On April 15, 1997, Dr. Burchfield noted that Plaintiff continued to have tibia pain and had been unsuccessful in going from two crutches to one.  (R. at 108.)  On June 3, 1997, Dr. Burchfield observed that Plaintiff had very little, if any, pain, but that she had been unable to progress from using two crutches to using one crutch, or no crutches.  (R. at 107.)  Dr. Burchfield diagnosed an enchondroma and recommended that  Plaintiff undergo an exisional biopsy of the area, bone graft to the defect and internal fixation.  (*Id.*)  After discussing the risks of surgery, Plaintiff decided she would like to proceed. (R. at 103; 107.)

16.     On April 14, 1997, P. Tulk, the C.F.N.P. with Dr. Kelley's office, wrote that Plaintiff was having hot flashes and surgical menopause due to a hysterectomy in 1995 and prescribed Premarin.[5]  (R. at 140.) On May 22, 1997, P. Tulk, wrote that Plaintiff was complaining of lower

---

[5] Premarin is indicated for treatment of the symptoms of menopause. PHYSICIANS' DESK REFERENCE 3302 (54th ed. 2000).

back pain and was crying and depressed because she had been attacked by her ex-husband. (R. at 136.) An X-ray revealed a sclerotic intramedullary proximal tibial deformity in Plaintiff's left tibia, but no evidence of fracture or subluxation. (R. at 137.) On June 16, 1997, Dr. Kelley noted that Plaintiff had a bone tumor in her left knee and referred her to Dr. Burchfield. (R. at 134.) It was also noted that Plaintiff was depressed. (*Id*.)

17.     On June 27, 1997, Plaintiff underwent an exisional biopsy, bone graft and internal fixation. (R. at 102.) On July 11, 1997, Dr. Burchfield saw Plaintiff for a follow up visit. (R. at 101.) Plaintiff's wounds had healed well and she was non-tender at the biopsy site. (*Id*.) Plaintiff felt that there was no significant improvement, but her husband stated that Plaintiff complained less than she had before surgery. (*Id*.)  Dr. Burchfield recommended that Plaintiff advance to weight bearing, with one crutch in her right hand, and when asymptomatic, proceed to cast boot alone. (*Id*.)

18.     On August 1, 1997, Plaintiff saw Dr. Burchfield and complained of difficulty ambulating. (R. at 98.) On examination, Plaintiff had a full range of knee motion and a normal neurovascular examination. (*Id*.) X-rays revealed satisfactory fixation with no interval change. (*Id*.) Dr. Burchfield recommended that Plaintiff advance to weight bearing, discontinue the cast boot, progress to one crutch in her right hand, and then to a cane in her right hand. (*Id*.)  On August 6, 1997, Plaintiff presented to Dr. Kelley's office complaining of leg pain. (R. at 132.)  She was prescribed Vicodin[6] and Tylenol # 3. (*Id*.)

19.     On August 29, 1997, Dr. Burchfield observed that Plaintiff was walking without crutches, but continued to complain of pain at night and with temperature changes. (R. at 95.)  Dr.

---

[6]  Vicodin is indicated for the relief of moderate to moderately severe pain. PHYSICIANS' DESK REFERENCE 1501 (54th ed. 2000).

Burchfield recommended that Plaintiff continue to increase activities and weight bearing as tolerated and suggested Tylenol for pain. (*Id.*) On August 29, 1997, Dr. Burchfield wrote that Plaintiff had been under his care since June 12, 1996 and that she was unable to work at a standing job due to pain in her left leg. (R. at 123.)

20.     On September 19, 1997, Dr. Kelley's office stated that Plaintiff still had leg pain secondary to surgery and was prescribed Vicodin. (R. at 131.) On October 28, 1997, C. Flurry, a PA-C at Dr. Kelley's office, wrote that Plaintiff's leg was "vastly improved" after the surgery and that Plaintiff had pain only "during the cold," and refilled Plaintiff's Vicodin. (R. at 128.) On December 19, 1997, Ms. Flurry wrote that Plaintiff had been going to Dr Burchfield in Lubbock, but that even with Medicaid, Plaintiff was unable to afford to continue to travel to Lubbock. (R. at 173.) Ms. Flurry prescribed Vicodin and Relafen.[7] (*Id.*) Plaintiff had a limited range of motion due to pain. (R. at 174.)

21.     On April 6, 1998, Dr. R.E. Pennington, M.D., Ph.D., examined Plaintiff and found that she had a good range of motion, but was in pain. (R. at 144.) Dr. Pennington diagnosed enchondroma of the proximal left tibia with open incisional biopsy and hardware placement. (*Id.*) Dr. Pennington recommended a consultation with Dr. Burchfield regarding hardware removal and opined that Plaintiff had no restrictions for weight bearing and should continue with activities such as walking. (*Id.*)

22.     On April 7, 1998, Plaintiff presented to Ms. Flurry, the PA-C at Dr. Kelley's office, and requested a handicap sticker, which was arranged. (R. at 171.) Ms. Flurry discontinued the

---

[7]   Relafen is a non-steroidal anti-inflammatory drug indicated for acute and chronic treatment of the symptoms of arthritis. PHYSICIANS' DESK REFERENCE 3036 (54th ed. 2000).

Vicodin and Tylenol #3 because they were not working and were upsetting Plaintiff's stomach, and prescribed Darvocet.[8]  (R. at 172.)   On April 27, 1998, Plaintiff complained to Ms. Flurry that the Darvocet was not working, and that she was unable to sleep and had headaches.  (R. at 169.)  Ms. Flurry suggested that Plaintiff try Benadryl for insomnia and prescribed Naprosyn.[9]  (*Id.*)

23.     On May 12, 1998, Dr. Aida L. Recalde, M.D., an agency physician, reviewed Plaintiff's medical records.  (R. at 147-154.)  Dr. Recalde opined that Plaintiff could only kneel occasionally, but otherwise her capacity to perform work related activities was unimpaired.  (R. at 149.)

24.     On May 6, 1998, Dr. Pennington noted that Plaintiff was taking Vicodin and Darvocet and diagnosed enchondroma (secondary neuroma) and graft site tenderness.  (R. at 160.)  Dr. Pennington noted that Plaintiff should continue with her medications and activities and might benefit from an aerobic and dynamic conditioning program. (*Id.*)

25.     On June 17, 1998, Dr. Javier Torres, M.D. stated that Plaintiff continued to have pain in her leg and felt like a tumor was growing on the medial aspect of her leg.  (R. at 159.)  Plaintiff had swelling, a popping in her fibula, a fracture of the fifth metacarpal bone on the right, and hip pain. (*Id.*)  The pain medications provided some relief, but Plaintiff had problems getting up due to the pain. (*Id.*)  Plaintiff was taking Darvocet and Vicodin.  (*Id.*)  Examination revealed mild swelling on the medial aspect of the left with tenderness on palpation on the lateral side of the left leg.  (*Id.*)  There was also a decreased range of motion with flexion of the knee.  (*Id.*)  Sensory ability was intact.

---

[8]  Darvocet is indicated for the relief of mild to moderate pain. PHYSICIANS' DESK REFERENCE 1371 (54th ed. 2000).

[9]  Naprosyn is indicated for the management of pain. PHYSICIANS' DESK REFERENCE 2632 (54th ed. 2000).

(*Id.*) Dr. Torres recommended that Plaintiff initiate the dynamic conditioning program recommended by Dr. Pennington. (*Id.*)

26.     On October 20, 1998, Carrie Flurry, the PA-C with Dr. Kelley's office, wrote that Plaintiff had sciatica and referred Plaintiff to a doctor in Albuquerque for pain management. (R. at 164.) Ms. Flurry prescribed Naprosyn, Paxil[10], Premarin, Cefaclor,[11] and Oxycodone[12] to Plaintiff on October 20, 1998. (R. at 182.) On October 28, 1998, Ms. Flurry wrote that she had been treating Plaintiff since April 1997, that nothing seemed to alleviate Plaintiff's pain, and that Plaintiff was being referred to Dr. Nairn in Albuquerque for pain management. (R. at 180.) Plaintiff was referred for an appointment with Dr. Nairn on November 30, 1998. (R. at 181.)

27.     Plaintiff was represented by counsel at the hearing before the ALJ on October 23, 1998. (R. at 205.) Plaintiff testified that she spent her days lying down on the couch and only got up to go to the bathroom. (R. at 210-211.) Her two children got themselves ready for school and fixed their own breakfasts. (R. at 211.) Plaintiff's boyfriend or her children cooked dinner. (R. at 212.) Plaintiff was able to prepare lunch in the microwave. (*Id.*) Plaintiff did not belong to any church or social groups, had no close friends, was unable to participate in recreational activities, and could not drive. (R. at 213.)

28.     Plaintiff graduated from high school and had attended word processing school for

---

[10] Paxil is indicated for the treatment of depression, obsessive compulsive disorder, panic disorder and social anxiety disorder. PHYSICIANS' DESK REFERENCE 3028 (54th ed. 2000).

[11]Cefaclor is an antibiotic. PHYSICIANS' DESK REFERENCE 990 (54th ed. 2000).

[12]Oxycodone is a pure agonist opioid indicated for the management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days. PHYSICIANS' DESK REFERENCE 2538 (54th ed. 2000).

about six months.  (R. at 213.)  Plaintiff could speak, read and write English and could speak some

Spanish.  (R. at 214.)  She had worked as a housekeeper.  (*Id.*)  On May 25, 1996, during a family

outing at the river, she slipped and fell into a tree, injuring her left leg.  (*Id.*)  On May 3, 1996, she had

also hurt her leg, but she did not know it was broken.  (R. at 215.)  Plaintiff also had pain in her hip

where the bone graft was taken.  (*Id.*)

29.     Plaintiff was seeing Carrie Flurry,  a nurse practitioner, for her leg pain.  (R. at 215-

216.)  Plaintiff had been taking medications for her pain since her injury.  (R. at 217.)  Plaintiff had

been walking with a cane for over a year and needed her boyfriend to help her.  (R. at 218.)  Her

medications made her drowsy.  (*Id.*)  On bad days she could not get up without help.  (R. at 219.)

Plaintiff was unable to lift anything due to the pain.  (*Id.*)  She also testified that she was unable to

sit for more than fifteen to thirty minutes due to the pain.  (*Id.*)  Her medication made her drowsy and

prevented her from working.  (R. at 220.)  The weather did not impact her condition, because she was

still in pain even in a warm bed.  (*Id.*)  A vocational expert was present at the hearing but did not

testify.  (R. at 205; 221.)

30.     After the ALJ issued his decision, Plaintiff submitted additional evidence that was

included in the record and considered by the Appeals Council.  On March 15, 1999, Plaintiff

presented to Dr. Galanty complaining of persistent pain in her left leg.  (R. at 192.)  On examination,

Plaintiff had a full range of motion in the knee, but tenderness over the anterior scar on her tibia.  (*Id.*)

No swelling was noted, but strength was decreased due to the pain.  (*Id.*)  X-rays showed no sign

of changes from the plate, a very good alignment, very good healing, and no loose screws. (*Id.*)  Dr.

Galanty opined that the pain was specifically related to the plate and recommended that Plaintiff see

pain management specialists before considering having the plate removed.  (*Id.*)  Dr. Galanty stated

that Plaintiff remained totally disabled and was unable to work. (*Id.*)

31.     On October 21, 1999, Plaintiff presented to Lovelace Health Systems in Albuquerque with complaints of chronic pain.  (R. at 196.)  It was noted that Plaintiff had been referred to orthopedics, who recommended that the hardware in her leg be removed.  (*Id.*)  Plaintiff did not follow through with the recommendation and was referred back to orthopedics.  (*Id.*)

32.     On December 15, 1999, Dr. R. Percy, M.D. of  the Lovelace Orthopedic Clinic evaluated Plaintiff and noted that Plaintiff had been in constant pain since her surgery and had been taking significant narcotics for the prior two years, including Oxycodone for the last three months.  (R. at 198.)  Plaintiff told Dr. Percy that the pain was worse than it had been in 1996 and 1997, she was unable to walk comfortably, and had been on her back for the prior month.  (*Id.*)  Plaintiff reported the most pain with walking, occasional pain at night that was alleviated by drugs, and that she could sit comfortably.  (*Id.*)  Plaintiff also complained of pain in her back at the site of the bone graft scar that increased with sitting and occasional numbness in her left foot.  (R. at 199.)

33.     On examination, Dr. Percy found that Plaintiff did not have any significant asymmetry in her leg musculature, but she was unable to walk comfortably and entered the clinic with a cane. (R. at 199.)  There was tenderness over the surgical scar and medially.  (*Id.*)  Plaintiff had a full range of motion and no swelling in her knee.  (*Id.*)  Reflexes were symmetrical bilaterally.  (*Id.*) Straight leg raising revealed some discomfort in the scar area but no specific tenderness in the sacroiliac joint. (*Id.*)  X-rays of Plaintiff's knee revealed a variegated patterns in the proximal tibia, suggestive of possible persistence of an enchondroma.   (R. at 200.)  Dr. Percy recommended a bone scan and planned to obtain Plaintiff's medical records from the time of her surgery.  (*Id.*)

**Discussion**

34.     Plaintiff contends that the ALJ erred in his evaluation of the her pain; failed to accord proper weight to the opinion of her treating medical providers; and erred in failing to utilize a vocational expert at step five.   In evaluating a claim of disabling pain, the appropriate analysis considers (1) whether there is objective medical evidence of a pain producing impairment, (2) whether there is a loose nexus between this objective evidence and the pain, and (3) whether, in light of all the evidence, both objective and subjective, the pain is in fact disabling. *Glass v. Shalala*, 43 F. 3d 1392, 1395 (10th Cir. 1994) (citing *Luna v. Bowen*, 834 F. 2d 161, 163 (10th Cir. 1987)).   The ALJ properly applied these factors in this case.

35.     At the first step of the *Luna* analysis, the ALJ found that the medical evidence established that Plaintiff had a medically determinable impairment of her left lower leg that was reasonably capable of producing pain. (R. at 18.)   At the second step of the *Luna* inquiry, the ALJ found that there was a loose nexus between this condition and Plaintiff's complaints of pain in her left lower leg.   (*Id.*)   At the third step of *Luna*, the ALJ determined that in light of all the evidence, both objective and subjective, the pain was not disabling. (R. at 18-20.)

36.     The ALJ observed that the medical evidence failed to establish the presence of a pain producing impairment of the magnitude alleged by Plaintiff, (R. at 19), noting that there were significant time lapses between contact with health care providers. (R. at 20.) The ALJ surmised that Plaintiff would have run out of pain medication during these gaps.  (*Id.*)  The ALJ also noted that Plaintiff's pain was reduced by Darvocet, a mild pain medication.  (*Id.*)  The ALJ further commented that Plaintiff's behavior at the hearing suggested that she was exaggerating her pain because her behavior was "in harsh contrast to the observations" of her medical providers. (R. at 19.)  Based on

all the evidence, the ALJ concluded that the record did not establish that Plaintiff suffered from disabling pain. (R. at 20) This determination is supported by substantial evidence and the ALJ applied correct legal standards.

37.     Significantly, the ALJ assessed the consistency of the non-medical testimony with the objective medical evidence and found Plaintiff's credibility to be lacking. (R. at 18-20.) Although Plaintiff does not challenge the ALJ's credibility determination, credibility is a key factor in cases involving complaints of disabling pain. *See Kepler v. Chater*, 68 F. 3d 387, 391 (10th Cir.1995). Plaintiff established that she suffers from a pain-producing impairment. The ALJ was therefore required to consider her complaints of pain by evaluating her use of pain medication, her attempts to obtain relief, the frequency of her medical contacts, the nature of her daily activities, as well as subjective measures of credibility including the consistency or compatibility of non-medical testimony with the objective medical evidence. (*Id.*) The ALJ correctly analyzed these factors in his decision and his credibility determination is supported by substantial evidence.

38.     Plaintiff asserts that the ALJ failed to accord proper weight to the opinion of her treating physician, Dr. Burchfield and her treating medical provider, Carrie Flurry, PA-C. On August 29, 1997, Dr. Burchfield wrote that Plaintiff had been under his care since June 12, 1996 and that she was unable to work at a standing job due to pain in her left leg. (R. at 123.) The ALJ discounted Dr. Burchfield's opinion that Plaintiff's ability to work was reduced for the same reasons he discounted Plaintiff's complaints of disabling pain. (R. at 20). The ALJ found Plaintiff was not credible, *inter alia*, because her complaints of disabling pain were inconsistent with the record as a whole. Thus, the ALJ disregarded Dr. Burchfield's opinion for the same reason.

39.     A treating physician's opinion must be given substantial weight unless good cause is

14

shown to disregard it.  *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F. 3d 288, 289-90 (10th Cir.1995).  However, a treating physician's opinion may be disregarded if it is not supported by specific findings or if it is inconsistent with other substantial evidence in the record.  *Castellano v. Secretary*, 26 F. 3d 1027, 1029 (10th Cir. 1994).  The ALJ considered Dr. Burchfield's August 29, 1997 opinion, but gave it limited weight because it was inconsistent with substantial evidence of record.  (R. at 19-20.)

40.  For instance, on January 8, 1997, Dr. Boss found Plaintiff had an excellent range of motion in her hip, knee, and ankle, but that her tibia was painful on palpitation.  (R. at 118.)  On February 25, 1997, Dr. Burchfield and Dr. Robinson wrote that Plaintiff did not have pain when she was not up on her feet.  (R. at 113.)  Examination revealed a full range of motion in her knee.  (*Id.*)  On July 11, 1997, Dr. Burchfield recommended that Plaintiff advance to weight bearing. (R. at 101.)  In May and June 1998, Dr. Pennington and Dr. Torres suggested that Plaintiff begin an aerobic and dynamic conditioning program.  (R. at 159.)  On December 15, 1999, Dr. Percy, noted that Plaintiff could sit comfortably.  (*Id.*)  Because Dr. Burchfield's opinion of August 29, 1997 was not supported by his own records, or the record as a whole, the ALJ properly discounted it.

41.  Plaintiff additionally argues that the ALJ erred in disregarding the reports and opinions of Carrie Flurry, the PA-C with Dr. Kelley's office.  Plaintiff points to Ms. Flurry's finding that her leg was "very painful to the touch" and that she had a limited range of motion.  (R. at 172-173.) Plaintiff does not contend that Ms. Flurry opined that she was disabled.

42.  The ALJ's discounted Ms. Flurry's notation that Plaintiff was depressed at step two of the sequential analysis because she was not an acceptable medical source from which a medically determinable impairment can be established.  (R. at 13.)  Although Plaintiff does not argue herein that

the ALJ erred in his determination that she did not have a severe mental impairment, it is worth noting that the ALJ did not err at step two and that substantial evidence supports his step two determination.

43.     At step two, it is the claimant's burden to demonstrate an impairment or combination of impairments that significantly limits her ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). The step two severity determination is based on medical factors alone, and "does not include consideration of such vocational factors as age, education, and work experience." *Williams v. Bowen*, 844 F. 2d 748, 750 (10th Cir.1988). The ALJ correctly noted that a physician's assistant is not an acceptable medical source under the regulations. *See* 20 C.F.R. §§ 404.1513(a); 416.913(a). Contrary to Plaintiff's argument contained in her Reply Brief, Ms. Flurry's records do not qualify as the report of an interdisciplinary team because they were not in the form of a report and were not signed by an acceptable medical source. *See* 20 C.F.R. § 416.913(a)(6). In sum, the ALJ did not err in finding that Ms. Flurry was not an acceptable medical source at step two.

44.     Observations of non-medical sources are not afforded the same weight as the opinions of physicians, but may be considered to help the ALJ understand how an impairment affects the claimant's ability to work. *See* 20 C.F.R. §§ 404.1513(e); 416.913(e). The ALJ considered Ms. Flurry's observations regarding Plaintiff's leg pain in his opinion. (R. at 15-17.) Indeed, the ALJ even quoted Ms. Flurry's October 28, 1997 notations that Plaintiff's leg condition had "vastly improved" after the surgery "other than pain during cold." (R. at 15.) The ALJ applied correct legal standards with respect to Ms. Flurry's observations and substantial evidence supports his determination.

45.     Finally, Plaintiff argues that the ALJ erred by not consulting a vocational expert. The ALJ found Plaintiff was not disabled at step five based on the Medical Vocational Guidelines (Grids).

16

At step five, the burden of proof shifts to the Commissioner to show that the claimant retains the residual functional capacity to do work which exists in the national economy. *Thompson v. Sullivan*, 987 F. 2d 1482, 1487 (10th Cir. 1993). In certain cases, at the fifth step, the ALJ may rely solely on the Grids.

46.     The Grids assume that a claimant's sole limitation is lack of strength, also known as an exertional impairment. *See* 20 C.F.R. Part 404, Subpt. P, App. 2, §200.00 (e)(2). In a case such as this, where a claimant presents evidence of both exertional and non-exertional impairments, the ALJ must make findings on how much a claimant's work ability is further diminished by the non-exertional limitations. *Id.* If the non-exertional limitations are significant enough to further reduce work capacity, the ALJ may not rely solely on the Grids but must instead give full consideration to all relevant facts, including expert vocational testimony if necessary, in order to determine whether a claimant is disabled. *See Channel v. Heckler*, 747 F. 2d 577, 583 (10th Cir. 1984).

47.     The grids cannot be used conclusively when a non-exertional impairment limits a claimant's ability to perform the full range of work in a particular residual functional capacity category. *See Talbot v. Heckler*, 814 F. 2d 1456, 1460 (10th Cir. 1987). When non-exertional limitations are present, the grids can only be used as a framework for considering the extent to which such limitations further diminish the claimant's ability to work by reducing the types of jobs that the claimant would otherwise be able to perform. *Talbot*, 814 F. 2d at 1460; 20 C.F.R. Pt. 404, Subpt. P., App. 2, § 200.00 (e)(2). In assessing the extent to which a claimant's ability to work is eroded by his non-exertional impairments, the ALJ will normally need to obtain the testimony of a vocational expert. *See Hargis v. Sullivan*, 945 F. 2d 1482, 1491 (10th Cir. 1991).

48.     In this case, a vocational expert was present at the hearing, but was not consulted.

17

(R. at 205; 221.)  Although the ALJ stated that he looked to Grids merely as a framework, the record indicates that the ALJ relied on the grids exclusively to meet the Commissioner's burden at step five because he did not consult with a vocational expert.

49.     A vocational expert was not required in this case because the ALJ found that Plaintiff was able to perform the full range of sedentary work that did not require more than occasional kneeling, crawling, or crouching and did not require climbing ropes, scaffolds or ladders.  (R. at 21-22.)  The ALJ concluded that Plaintiff's non-exertional impairment (the restriction from more than occasional kneeling, crawling, or crouching and from climbing ropes, scaffolds or ladders) did not significantly erode the vocational base such that a vocational expert was required.   (R. at 20; 22.)

51.     In determining that a vocational expert was not required, the ALJ cited to Soc. Sec. Rul. 96-9p, 61 Fed. Reg. 34478 (Jul. 2, 1996).   Ruling 96-9p provides that postural limitations related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually significantly erode the occupational base for the full range of sedentary work because such activities are not normally required in sedentary work.  Soc. Sec. Rul. 96-9p, Soc. Sec. Rep. Serv., Rulings at 159.  Through this Ruling, the Commissioner has recognized that most sedentary jobs do not required more than occasional kneeling, crawling, or crouching and do not require any climbing of ropes, scaffolds or ladders.  *Id.*  Because Plaintiff's limitation were vocationally insignificant, the ALJ was not required to consult with a vocational expert.  *Davis v. Callahan*, 1997 WL 438772, *13 (S.D.N.Y. Aug. 4, 1997).  The ALJ properly relied on the grids to meet the Commissioner's burden at step five.

52.     The ALJ applied correct legal standards and substantial evidence supports his decision.

18

## RECOMMENDED DISPOSITION

I recommend that Plaintiff's Motion to Reverse and Remand (Doc. 9), filed August 13, 2001, be denied.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may file with the Clerk of the United States District Court, 333 Lomas Blvd. NW, Albuquerque, NM 87102, written objections to such proposed findings and recommendations.  A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**